Timothy J. Mulreany (Maryland Bar No. 8812160123)
Danielle E. Karst (D.C. Bar No. 481881)
**COMMODITY FUTURES TRADING COMMISSION**
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone:  (202) 418-6158 (Karst)
Telephone:  (202) 418-5306 (Mulreany)
Facsimile:  (202) 418-5523
tmulreany@cftc.gov
dkarst@cftc.gov

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | **Case No. 1:22-cv-635** |
| **Plaintiff,** | **COMPLAINT FOR INJUNCTIVE RELIEF, RESTITUTION, DISGORGEMENT AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT** |
| **v.** | |
| **MIRROR TRADING INTERNATIONAL PROPRIETARY LIMITED, and CORNELIUS JOHANNES STEYNBERG** | |
| **Defendants.** | |

Plaintiff, Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

## I.    SUMMARY

1.      From at least May 18, 2018 through at least March 30, 2021 (the "Relevant Period"), Cornelius Johannes Steynberg ("Steynberg"), individually and as the controlling person of Mirror Trading International Proprietary Limited ("MTI"), engaged in an international fraudulent multilevel marketing ("MLM") scheme, using the websites *www.mirrortradinginternational.au.za, www.mtimembers.com,* and *www.mymticlub.com,* in addition to social media, to solicit Bitcoin from members of the public for participation in a commodity pool operated by MTI ("commodity pool" or "Pool").  The commodity pool was

controlled by Defendants MTI and Stenberg (collectively, "Defendants") and purportedly traded off-exchange, retail foreign currency ("forex") on a leveraged, margined and/or financed basis with participants who were not eligible contract participants ("ECPs") through a proprietary "bot" or software program.  During the Relevant Period, Steynberg, individually and as the principal and agent of MTI, accepted at least 29,421 Bitcoin—with a value of over $1,733,838,372 at the end of the Relevant Period—from at least 23,000 individuals from the United States, and even more throughout the world, to participate in the commodity pool without being registered as a Commodity Pool Operator as required.  Upon information and belief, most if not all of these participants were non-ECPs.  Defendants misappropriated, either directly or indirectly, all of the Bitcoin they accepted from pool participants.

2.    In furtherance of the fraudulent scheme, Steynberg, individually and as the agent of MTI,  made fraudulent omissions of material facts in solicitations to actual and prospective pool participants, including but not limited to failing to disclose that:  (a) Defendants misappropriated pool funds; (b) there was no trading "bot" successfully trading on behalf of participants; (c) no profitable trading in forex or anything else took place on behalf of participants; (d) "account statements" provided to participants were actually simulated trades from "demo" accounts created via the MetaTrader 4 ("MT4") electronic trading platform; (e) purported "returns" paid to some participants were in fact the principal deposits of other participants; and (f) the online broker Trade300, where Defendants purportedly traded participants' Bitcoin, was a fictitious entity created by Steynberg to further the fraudulent scheme.

3.    In furtherance of the fraudulent scheme, Steynberg, individually and as the agent of MTI, made fraudulent misrepresentations of material facts in website and social media

solicitations, which he controlled, to actual and prospective pool participants, including but not limited to his claims that:  (a) Defendants' trading "bot" achieved "profits" of 10% per month; (b) Defendants traded participants' Bitcoin in a pooled account, first at FXChoice, Ltd. ("FXChoice") and later at the fictitious entity Trade300; (c) MTI's trading "system is a sustainable business model and one that can provide you with the residual income you have always desired"; and (d) the MTI Pool had never had a losing trading day except for one day. All of these representations were false.

4.     In the only pooled account Defendants held, at FX Choice, a broker located in Belize, and which they falsely claimed was trading profitably, Defendants only deposited 1,846 Bitcoin and lost 566.6 Bitcoin trading unprofitably.  Defendants never traded profitably, never earned any profits trading, and misappropriated essentially all of the at least 29,421 Bitcoin they accepted from participants.

5.     In early 2021, MTI was the subject of bankruptcy proceedings in the Republic of South Africa.  By April 2021, the South African Financial Sector Conduct Authority ("FSCA") was working with South African bankruptcy liquidators, as MTI had been placed into liquidation.  Shortly thereafter, it was learned that FXChoice had frozen Defendants' Pool account (account No.**4850, referred to hereinafter as "FXChoice Pool account" or "Pool account"), eight months earlier, on or about August 7, 2020, for suspected fraud.  At the time FXChoice froze the Pool account, it held only 1,280 Bitcoin, with a value of approximately $56.3 million.  These frozen participant Bitcoin were ultimately transferred by FXChoice to South African liquidators.

6.     Of the 29,421 Bitcoin participants sent to Defendants' E-Wallets, controlled by Steynberg, for trading in the MTI pool during the Relevant Period, Defendants deposited only

1,846.72 into the Pool account.  Defendants' claims that it traded participants' Bitcoin at a pooled account at Trade300 were false; no such entity exists.  Therefore, Defendants failed to deposit 27,574 Bitcoin from participants into the Pool account at FXChoice.  Defendants' limited trading in the FXChoice Pool account resulted in overall losses, and Defendants misappropriated the remaining 27,574 Bitcoin sent by participants to Defendants for trading, including by failing to use all of the funds for trading and by providing Bitcoin to certain participants as sham "profits" and "bonus" payments in the nature of a "Ponzi" scheme.

7.      MTI acted at all times during the Relevant Period as a commodity pool operator ("CPO") without being registered with the CFTC, as required by the Commodity Exchange Act ("Act").  Throughout the Relevant Period, Steynberg acted as an associated person ("AP") of CPO MTI without being registered with the CFTC, as required by the Act.

8.      By this conduct, and the conduct further described herein, Defendants have engaged, are engaging and/or are about to engage in acts and practices in violation of Sections 2(c)(2)(C)(iii)(I)(cc), 4b(a)(2)(A)-(C), 4k(2), 4m(1), and 4$o$(1)(A)-(B) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A)-(C), 6k(2), 6m(1), 6$o$(1)(A)-(B), and Commission Regulations ("Regulation(s)")  4.20(a)(1), (b), (c), 5.2(b)(1)-(3), and 5.3(a)(2)(i), (ii), 17 C.F.R. §§ 4.20(a)(1), (b), (c), 5.2(b)(1)-(3), 5.3(a)(2)(i), (ii) (2021).

9.      The acts and omissions described herein have all been done by Steynberg in the scope of his employment or office at MTI during the Relevant Period.  Therefore, MTI is liable for all acts and omissions described herein by Steynberg, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2021).

10.     Steynberg is a controlling person of MTI and did not act in good faith or knowingly induced MTI's violations of the Act and Regulations described herein during the

Relevant Period.  Therefore, Steynberg is liable for MTI's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

11.     Accordingly, pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1, the CFTC brings this action to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act and the Regulations.  In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other and further relief as the Court deems necessary and appropriate.

12.     Unless restrained and enjoined by this Court, Defendants will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as described below.

## II.     JURISDICTION AND VENUE

13.     This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that U.S. district courts possess jurisdiction to hear actions brought by the CFTC for injunctive relief or to enforce compliance with the Act whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder, and Section 2(c)(2)(c) of the Act, 7 U.S.C. § 2(c)(2)(c), provides the CFTC with jurisdiction over the forex solicitations and transactions at issue in this action.

14.     Venue lies properly with this Court pursuant to 7 U.S.C. § 13a-1(e) because Defendants resided and/or transacted business in this District, and certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this District.

### III.    THE PARTIES

15.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1-26, and the Regulations promulgated thereunder, 17 C.F.R. pts. 1–190 (2021).

16.     Defendant **Cornelius Johannes Steynberg** is a citizen of the Republic of South Africa.  Steynberg's last known residence is in Stellenbosch, Western Cape South Africa. Currently, he is a fugitive from South African law enforcement but was recently detained in the Federative Republic of Brazil ("Brazil") on an INTERPOL arrest warrant.  Throughout the Relevant Period, Steynberg held himself out as the Shareholder, Director and CEO of MTI. Steynberg has never been registered with the CFTC in any capacity.

17.     Defendant **Mirror Trading International Proprietary Limited** is a company organized and operated pursuant to the laws of the Republic of South Africa, with a principal place of business in Stellenbosch, Western Cape South Africa.  MTI has never been registered with the CFTC in any capacity.

### IV.    STATUTORY BACKGROUND

18.     Section 2(c)(2)(C)(i)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(i)(I), in relevant part, applies to any agreement, contract, or transaction in, or in connection with, forex that is offered to, or entered into with, a person that is not an ECP "on a leveraged or margined basis, or

financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis," subject to certain exceptions not applicable here.

19.     An ECP is defined by Section 1a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi), in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of $10,000,000, or $5,000,000 and who enters into the agreement, contract or transaction to manage the risk associated with an asset owned or a liability incurred, or reasonably likely to be owned or incurred, by the individual.

20.     For the purposes of trading forex, a CPO is defined in Section 1a(11) of the Act, 7 U.S.C. § 1a(11), in relevant part, as:  "The term 'commodity pool operator' means any person—engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—agreement, contract, or transaction described in section 2(c)(2)(C)(i) or section 2(c)(2)(D)(i)."

## V.     FACTS

**A.     The Fraudulent Scheme**

    **1.     The Initial Scheme**

21.     Steynberg founded MTI in the Republic of South Africa in April 2019. Throughout the Relevant Period, Defendants, by and through Steynberg, accepted at least 29,421 Bitcoin with a value of not less than $1,733,838,372 at the end of the Relevant Period from at least 23,000 participants from the United States and throughout the world to participate in the unregistered commodity pool.  Most if not all of these participants were non-ECPs based upon

information and belief.  Defendants, through Steynberg, knowingly and falsely represented to actual and prospective pool participants that Defendants operated a pooled forex account, using an experienced trader to produce consistent, high rates of return.  Steynberg held himself out as the founder and CEO of MTI.

22.     Throughout the Relevant Period, Defendants solicited actual and prospective participants through social media such as Facebook, Instagram, and YouTube.  Defendants also solicited through in-person meetings, word-of-mouth, instant messaging services such as Telegram, podcasts, and websites operated by Steynberg, including *www.mirrortradinginternational.au.za, www.mtimembers.com, www.mymticlub.com*, and *www.mymticlub.com* (collectively, the "websites").  Defendants accepted Bitcoin from at least 23,000 participants located in the United States, with 1,341 known participants located in the State of Texas.  Defendants also relied heavily upon MLM marketers to tout MTI, and paid both participation and referral bonuses to MLM touters from non-existent "profits."

### 2.     Defendants' Solicitations to Participants

23.     Steynberg, individually and as the agent of MTI, claimed in social media solicitations to actual and prospective participants that "the objective of Mirror Trading International is to grow your Bitcoin."  Steynberg, individually and as the agent of MTI, represented that MTI had a "sustainable business model trading forex using Advanced Intelligence Software with Bitcoin as the base currency," and "[T]he profitability of Mirror Trading International comes solely from the trading activities.  Your full investment goes into the trading account."

24.     Defendants targeted their solicitations to non-ECPs with limited trading experience, claiming participants could earn "passive income" by funding their investment with

"as little as $100" and "no trading experience required."  The only requirements to become a participant, pursuant to Defendants' social media, were that a prospective participant was at least 18 years of age and had Bitcoin to fund participation in the Pool.  The minimum participation amount was $100, or a fraction of a Bitcoin.

25.     Steynberg, individually and as the agent of MTI, represented through social media that there were "no membership fees, no subscriptions, no packages, no costs & no deductions." Steynberg, individually and as the agent of MTI, claimed MTI's trading "bot" achieved "profits" of 10% per month, and that the MTI Pool had never had a losing trading day except for one day. Steynberg, individually and as the agent of MTI, represented to actual and prospective participants via social media that:  "The system is fully automated and you will receive your daily [pool participant] statement detailing the profits or loss from the trades for the day.  These statements will be in your back office from Tuesdays to Saturdays."

26.     Defendants provided each pool participant access to what Defendants referred to as a "back office," which was an online statement each participant could access using their login credentials to view how much profit their Bitcoin investment purportedly earned in the Pool account.  Defendants advised participants that:  "Your daily trade profits are automatically compounded in the trading pool."  Steynberg, individually and as the agent of MTI, also represented to participants that they could withdraw their funds, in full or in part, at any time, and that participants' Bitcoin would be sent to their Bitcoin wallet within 48 hours of a withdrawal request.

27.     In order to rapidly increase the number of participants, and concurrently increase the amount of Bitcoin sent from participants to the Pool, Defendants utilized an MLM marketing scheme described as an "affiliate program" for those wishing "to refer friends and family."  The

"affiliate program" had three basic levels:  the direct referral bonus; the "weekly binary profit-sharing pool;" and, the "leadership bonus."  A participant qualified for the referral bonus by referring new participants to the Pool.  The "weekly binary profit-sharing pool" was modeled on a standard MLM program, with "left and right legs" of new participants associated with a single MLM marketer.  In order to be "binary qualified," an MLM marketer had to reach certain Bitcoin investment "levels," with each level requiring a greater amount of Bitcoin investment. The higher the "level," the more one purportedly earned.  Finally, MLM marketers in the "weekly binary profit-sharing pool" could also qualify for the "Part One (P1) and Part Two (P2) Leadership Pools."  In order to qualify for the P1 and P2 Pools which "automatically reward[ed] with P1 & P2 bonuses," one had to "help as many people in your team become Binary Qualified."

28.     The "affiliate program" promised substantial "first and second level" MLM "bonus payments" as well as "referral bonuses" to MLM participants.  Steynberg, individually and as the agent of MTI, represented via social media that of each day's "daily trading profits," participants would share 40%, with "binary affiliate program" participants sharing an additional 20% and "affiliate program P1/P2 pool" participants sharing an additional 5%.  Finally, the purported "trader" would take 25% of the "daily trading profits," and MTI would take the remaining 10%.  Defendants failed to explain how the 10% "direct referral bonus" would be available to be paid after the "daily trading profits" were divided as described above.

29.     Steynberg testified under oath before the FSCA on July 20, 2020, that at the time of MTI's formation in April 2019, MTI purportedly entered into a profit-sharing agreement with a trader named "Quinton," who was to conduct all trading on behalf of all members.  Steynberg testified that "Quinton" purportedly used an FXChoice multi-account manager ("MAM"

account) "linked" to each participant's individual account to control the trading in all

participants' accounts.  Steynberg opened and controlled the MAM account in MTI's name at

FXChoice.

30.      Steynberg testified under oath before the FSCA that from April 2019 to July

2019, participants initially had their own accounts that were "linked" to MT4, and MT4 traded

the accounts automatically.  Steynberg testified that in July 2019, due to heavy trading losses, all

participants had their purported individual accounts closed and all Bitcoin transferred to a single

pooled account controlled by Defendants.  Specifically, Steynberg testified:

> No our members do not have access to Meta Trader, when we just started in April
> last. I had it set up that every single member had his own account with the
> Brokerage themselves on a mam account. And then we, we actual (sic) back then
> had physical  human traders and they good profit (sic) for April, May and in June
> they lost about 80 percent. So I got rid of them and got the software working for
> us… the only way not for people to steal our trades was to bring everything into a
> global pool which MTI has now and we do out (sic) trading you know, on that pool
> account.

31.      Following the heavy losses stained in the April to July 2019 time period,

Defendants sent a notice to each participant stating in relevant part:

> Over the last couple of weeks, MTI had issues with the traders, which resulted in
> losses for ourselves and the members.  We have a solution to recover all member's
> funds.  Those willing to take the journey with us over the next few weeks will be
> happily surprised with the trading system that we managed to put together for our
> members. . . . At the moment, it is not possible to deploy the trading system on all
> FXChoice accounts due to licensing restrictions.  We are, however, allowed to use
> the system in a pooled account environment. To switch to the pooled account,
> please follow the steps below.

### 3.     The MTI Pooled Account at FXChoice

32.      Defendants opened a single commodity pool account in the name of MTI at

FXChoice, account No.**4850, in August 2019.  Defendants falsely represented to actual and

prospective participants that MTI operated a commodity pool that traded forex agreements,

contracts or transactions, on a leveraged, margined or financed basis, and that the only assets

they accepted for investment in the Pool account was Bitcoin. Specifically, Defendants claimed

to be trading foreign currency pairs in the Pool account on a leveraged or margined basis,

initially at FXChoice, and later purportedly at Trade300. Pool participants registered via

Defendants' websites, where they were advised that Defendants only accepted Bitcoin to secure

their participation in the Pool. Defendants directed participants to transfer their Bitcoin to one of

the MTI E-Wallets, which were controlled by Steynberg. Defendants then purportedly

transferred the Bitcoin to the MTI Pool account at FXChoice, and later, to an MTI Pool account

purportedly at Trade300.

33.    Throughout the Relevant Period, Steynberg was in sole control of the MTI E-

Wallets receiving participants' funds and controlled the movement of Bitcoin from the MTI E-

Wallets to FXChoice accounts and elsewhere.

34.    Beginning on or about August 2019, Steynberg, individually and as the agent of

MTI, represented to actual and prospective participants that MTI used a high frequency artificial

intelligence trading "bot," together with a "head trader" and a "trading team," that purportedly

traded the Pool's account at FXChoice, earning large profits. These representations were false.

FXChoice records show that the Pool account traded using only a small fraction of participants'

Bitcoin, that this limited trading was at an overall loss, and that Steynberg made many of the

trades via a mobile device.

35.    After Defendants created the purported FXChoice Pool account, they provided

"trading statements" showing profitable trades on behalf of the Pool in this account. In fact,

these "trading statements" were not associated with any actual pooled accounts, but were in fact

statements from a simulated "demo" account that never actually traded forex, Bitcoin or anything

else.  Defendants failed to disclose to participants that all of Defendants' representations to participants regarding trading, profitability and/or the existence of a commodity pool account were false.  Defendants further failed to disclose to participants that all of the purported "trading statements" were false and created by  Defendants.

### 4.    The Final Phase of the Scheme

36.    On or about June 8, 2020, FXChoice began receiving complaints from MTI participants that the trades shown in MTI's trading reports provided to participants did not correlate with the live trades purportedly made in MTI's Pool account.  FXChoice conducted a compliance review of the MTI Pool account and determined that the "account statements" provided to participants were actually simulated trades from "demo" accounts created by Steynberg, individually and as the agent of MTI, via the MT4 application.  FXChoice further determined that Defendants deleted any of the "demo" accounts' "losing" trades in the "account statements" and presented only "winning trades," thereby giving the false impression to participants that Defendants' trading "bot" was profitably trading.  Finally, FXChoice determined that a number of trades in MTI's FX Choice Pool account were manually placed via a mobile device.

37.    As a result of its compliance investigation, on June 10, 2020, FXChoice blocked all transactions in MTI's Pool account pending a compliance review.  On July 13, 2020, Steynberg, individually and as the agent of MTI, unsuccessfully attempted to withdraw 280 Bitcoin from the blocked Pool account.  FXChoice refused Defendants' withdrawal request and informed Defendants that they were required to provide audited financial statements for MTI. As a result of Defendants' failure to provide FXChoice with the requested audited financial statements, on August 7, 2020, FXChoice marked the Pool account No.**4850 as "fraud" and

froze the 1,280 Bitcoin remaining in the account.

38.    Subsequently, Steynberg, individually and as the agent of MTI, represented to participants that MTI would transfer all of the Pool's trading accounts from FXChoice to a purported online broker identified as Trade300.  Steynberg, individually and as the agent of MTI, represented to participants that Trade300 was another online forex trading platform, and that MTI continued to earn large profits while trading through Trade300.  Steynberg testified before the FSCA that MTI's Pool account at Trade300 averaged trading profits of 10% per day, and that the MTI Pool account never experienced a negative profit trading day.  Upon information and belief, Trade300 is a fictious trade broker created by Steynberg to further the fraudulent scheme.

**B.    Defendants' Misappropriation and Commingling of Participants' Funds**

39.    Steynberg, individually and as the agent of MTI, misappropriated pool participants' funds by soliciting funds for trading on behalf of the Pool and then depositing and holding participants' funds in E-Wallets controlled by Steynberg instead of segregating the funds in a pool account and using the funds to trade on behalf of the Pool's participants.

40.    Throughout the Relevant Period, participants sent 29,421 Bitcoin to Defendants' E-Wallets as instructed.  However, Defendants deposited only 1,846.72 of participants' 29,421 Bitcoin into the FXChoice Pool account.  Defendants never deposited the remaining 27,574 Bitcoin into the FXChoice Pool account or any account at Trade300, and failed to use those funds for any trading on behalf of participants.  Instead, Steynberg, individually and as the agent of MTI, misappropriated participants' Bitcoin for his personal use.

41.    Defendants also misappropriated some of participants' funds by providing Bitcoin to certain participants as purported trading "profits" or "bonuses" in order to create the illusion that the Pool was trading and trading profitably.

42.     At no time did Defendants create, or MTI operate, the Pool as an entity cognizable as a legal entity separate from the pool operator, MTI.  As a result, at no time were any assets, in this case Bitcoin, from pool participants received in the Pool's name because a separate legal entity in the name of the pool was never created.  Instead, all Bitcoin were sent directly from participants to E-Wallets owned and controlled by Defendants.

43.     During the Relevant Period, Defendants, by and through Steynberg, failed to maintain pool assets separately from Steynberg's own funds.  Steynberg, individually and as the agent of MTI, commingled pool participants' assets with personal funds of Steynberg.  As described above, pool participants deposited Bitcoin into E-Wallet(s) controlled by Steynberg. Defendants held these assets in Steynberg's personal E-Wallets instead of segregating them in a pool account.

**C.     Defendants' Material Omissions and Misrepresentations of Material Facts**

44.     In furtherance of the fraudulent scheme, Defendants knowingly made material omissions of fact in solicitations and other communications with actual and prospective pool participants, including by failing to disclose that:

a.      Defendants misappropriated pool participants' funds by soliciting funds for trading and then retaining participants' funds in Steynberg's personal E-Wallets instead of segregating the funds in a pool account and using the funds to trade on behalf of the Pool;

b.      There was no trading "bot" successfully trading on behalf of participants;

c.      No profitable trading in forex, or anything else, took place on behalf of pool participants;

d.    "Account statements" provided to participants were actually simulated trades from "demo" accounts created via the MT4 application;

e.    The broker Trade300 did not exist and was created by Steynberg to further the fraudulent scheme; and,

f.    Purported "returns" paid to some pool participants were in fact the principal deposits of other participants and were not generated by profitable trading.

45.    Similarly, during the Relevant Period, Defendants, by and through Steynberg, misrepresented, among other things, that:

a.    Pool participants' Bitcoin would be pooled and used to trade forex contracts on participants' behalf;

b.    Profits were achieved through trading; and

c.    Trading "profits" were distributed to participants.

46.    These representations were false because Defendants deposited only a small portion of participants' Bitcoin into the FXChoice Pool account for a limited time period.  The FXChoice Pool account never traded profitably, there was no Trade300 account, and there were no profits to distribute to participants.

**D.    Defendants' Failure to Register**

47.    During the Relevant Period, MTI acted in a capacity as a CPO by soliciting, accepting, and receiving funds, securities, or property, in this case Bitcoin, from the public while engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of, among other things, trading in forex, without being registered with the CFTC as a CPO.

48.    Throughout the Relevant Period, Steynberg acted in a capacity as an AP of MTI

by, in his capacity as a partner, officer, employee, consultant or agent of the CPO MTI, soliciting or supervising the solicitation of funds for participation in the Pool, without being registered with the CFTC as an AP of a CPO.

49.     On or about July 27, 2020, the Texas State Securities Board ("TSSB") issued a Cease and Desist Order against Steynberg and MTI, among others, finding their solicitations were materially misleading, and that they were operating a fraudulent MLM scheme involving digital assets and forex, which had defrauded Texas residents.  The TSSB ordered Steynberg and MTI to immediately cease and desist all operations in the State of Texas.  Despite the issuance of this Order, upon information and belief Defendants continued to unlawfully solicit residents in Texas.

### VI.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND CFTC REGULATIONS

#### COUNT ONE (ALL DEFENDANTS)
**Violations of Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C), and Regulation § 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3) (2021)**
**(Fraud in Connection with Forex)**

50.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

51.     7 U.S.C. § 6b(a)(2)(A)-(C) makes it unlawful:

[F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, [. . .] that is made, or to be made, for or on behalf of, or with, any other person other than on or subject to the rules of a designated contract market – (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

52.     Pursuant to Section 2(c)(2)(C)(iv) of the Act, 7 U.S.C. § 2(c)(2)(C)(iv), 7 U.S.C. § 6b applies to the forex agreements, contracts, or transactions offered by Defendants "as if" they were contracts of sale of a commodity for future delivery.  Further, Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I), makes the forex agreements, contracts, or transactions here "subject to" 7 U.S.C. § 6b.  Finally, Section 2(c)(2)(C)(vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(vii), makes clear the CFTC has jurisdiction over an account or pooled investment vehicle that is offered for the purpose of forex transactions described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. § 2(c)(2)(C)(i).

53.     17 C.F.R. § 5.2(b)(1)-(3) makes it unlawful for any person, by use of the mails or by any instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction:  (1) to cheat or defraud or attempt to cheat or defraud any person; (2) willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or (3) willfully to deceive or attempt to deceive any person by any means whatsoever.

54.     As described herein, Steynberg cheated or defrauded, or attempted to cheat or defraud, and willfully deceived, or attempted to deceive, other persons in connection with Defendants' offering of, or entering into, off-exchange leveraged or margined forex transactions with non-ECPs, by, among other things:  (i) fraudulently soliciting participants and prospective participants by making material misrepresentations and omissions about, among other things, MTI's trading abilities and profits; (ii) misappropriating participants' funds; and (iii) posting false account statements of participants' profits from demo trading, all in violation of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3).

55.     The foregoing acts, omissions, and failures by Steynberg occurred within the

scope of his employment, agency, or office with MTI during the Relevant Period. Therefore, MTI is liable for Steynberg's violations of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2021).

56.     Steynberg held and exercised direct and indirect control over MTI and either did not act in good faith or knowingly induced MTI's violations of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3) during the Relevant Period. As a controlling person of MTI, Steynberg is liable for MTI's violations of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3) pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

57.     Each misrepresentation, omission of material fact, false statement, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3).

### COUNT TWO (ALL DEFENDANTS)
**Violations of Section 4*o*(1)(A)-(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B)**
**(Fraud by a CPO; Fraud by an AP of a CPO)**

58.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

59.     Throughout the Relevant Period, MTI acted and continues to act as a CPO, as defined by Section 1a(11) of the Act, 7 U.S.C. § 1a(11), by soliciting, accepting, or receiving funds or property (in the form of Bitcoin) from the public while engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading in off-exchange, leveraged or margined forex transactions.

60.     For the purposes of retail forex transactions, a CPO is defined in 17 C.F.R. § 5.1(d)(1) (2021) as "any person who operates or solicits funds, securities, or property for a

pooled investment vehicle that is not an eligible contract participant as defined in section 1a(18) of the Act, and who engages in retail forex transactions." MTI was not an ECP as defined in section 1a(18) of the Act, 7 U.S.C. § 1a(18).

61.    An AP of a CPO is defined by Regulation 1.3, 17 C.F.R. § 1.3 (2021), as any person who is associated with a CPO as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged. Throughout the Relevant Period, Steynberg acted as an AP of CPO MTI by soliciting funds or property (in the form of Bitcoin) for participation in the Pool and/or supervised other persons so engaged.

62.    Further, pursuant to 17 C.F.R. § 5.1(d)(2) (2021), any person associated with a CPO "as a partner, officer, employee, consultant or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves: (i) [t]he solicitation of funds, securities, or property for a participation in a pooled vehicle; or (ii) [t]he supervision of any person or persons so engaged" is an AP of a retail forex CPO.

63.    Pursuant to Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I), "[a]greements, contracts, or transactions" in retail forex and accounts or pooled investment vehicles "shall be subject to . . . section[ ] 4o [7 U.S.C. § 6o]," except in circumstances not relevant here.

64.    7 U.S.C. § 6o(1)(A)-(B) prohibits CPOs and APs of CPOs, whether registered with the CFTC or not, from using the mails or any means or instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes or artifices to defraud any

actual or prospective participant, or engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any actual or prospective participant.

65.    As alleged herein, Defendants employed a device, scheme, or artifice to defraud actual and prospective participants or engaged in transactions, practices, or a course of business which operated as a fraud or deceit upon any actual or prospective participant, including without limitation, fraudulent solicitations to actual and prospective participants that contained misrepresentations and omissions of material facts, and misappropriation of participants' funds, all in violation of 7 U.S.C. § 6*o*(1)(A)-(B).

66.    The foregoing acts, omissions, and failures by Steynberg occurred within the scope of his employment, agency, or office with MTI during the Relevant Period.  Therefore, MTI is liable for Steynberg's violations of 7 U.S.C. § 6*o*(1)(A)-(B) pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

67.    Steynberg held and exercised direct and indirect control over MTI and either did not act in good faith or knowingly induced MTI's violations of 7 U.S.C. § 6*o*(1)(A)-(B) during the Relevant Period.  As a controlling person of MTI, Steynberg is liable for MTI's violations of 7 U.S.C. § 6*o*(1)(A)-(B), pursuant to 7 U.S.C. § 13c(b).

68.    Each act of fraudulent solicitation, misappropriation and false statement, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A)-(B).

**COUNT THREE (ALL DEFENDANTS)**
**Violations of Regulation 4.20(a)(1), (b), and (c), 17 C.F.R. § 4.20(a)(1), (b), (c) (2021)**
**(Failure to Operate Commodity Pool as a Separate Legal Entity, Failure to Receive Funds in the Pool's Name, and Commingling of Pool Funds)**

69.    The allegations set forth in the preceding paragraphs are re-alleged and

incorporated herein by reference.

70.     17 C.F.R. § 4.20(a)(1) requires a CPO to operate their commodity pool as an entity cognizable as a legal entity separate from that of the pool operator, with certain specified exceptions not applicable here.

71.     During the Relevant Period, MTI, while acting as a CPO, violated 17 C.F.R. § 4.20(a)(1) by failing to operate the commodity pool as a legal entity separate from itself.

72.     17 C.F.R. § 4.20(b) provides:  "All funds, securities or other property received by a commodity pool operator from an existing or prospective pool participant for the purchase of an interest or as an assessment (whether voluntary or involuntary) on an interest in a pool that it operates or that it intends to operate must be received in the pool's name."

73.     During the Relevant Period, MTI, while acting as a CPO, violated 17 C.F.R. § 4.20(b) by receiving funds from existing or prospective pool participants for the purchase of an interest in the Pool without receiving the same in the Pool's name.

74.     17 C.F.R. § 4.20(c) provides, "[n]o commodity pool operator may commingle the property of any pool that it operates or that it intends to operate with the property of any other person."

75.     During the Relevant Period, MTI, while acting as a CPO, violated 17 C.F.R. § 4.20(c) by commingling pool funds with the personal funds of Steynberg.

76.     Steynberg held and exercised direct and indirect control over MTI and either did not act in good faith or knowingly induced MTI's violations of 17 C.F.R. § 4.20(a)(1), (b), and (c) during the Relevant Period.  As a controlling person of MTI, Steynberg is liable for MTI's violations of 17 C.F.R. § 4.20(a)(1), (b), and (c) pursuant to 7 U.S.C. § 13c(b).

77.     Each act of failing to operate the Pool as a separate legal entity, failing to receive

funds in the Pool's name, and commingling of pool funds, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.20(a)(1), (b), and (c).

**COUNT FOUR (ALL DEFENDANTS)**
**Violations of Sections 2(c)(2)(C)(iii)(I)(cc), 4m(1), and 4k(2) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), 6k(2), and Regulations 5.3(a)(2)(i) and (ii), 17 C.F.R. §§ 5.3(a)(2)(i), (ii) (2021)**
**(Failure to Register as a CPO; Failure to Register as an AP of a CPO)**

78.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

79.     7 U.S.C. § 6m(1) makes it unlawful for any CPO, unless registered with the CFTC, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO.  Similarly, 17 C.F.R. § 5.3(a)(2)(i) requires anyone acting as a CPO for a pooled investment vehicle that engages in retail forex transactions to register as a CPO.

80.     Subject to certain exceptions not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) states in part, that:

> A person, unless registered in such capacity as the Commission by rule, regulation, or order shall determine and a member of a futures association registered under section 17, shall not . . .
>
>  . . . .
>
> (cc) operate or solicit funds, securities, or property for any pooled investment vehicle that is not an eligible contract participant in connection with [applicable retail forex agreements, contracts, or transactions].

81.     Except in circumstances not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) and 17 C.F.R. § 5.3(a)(2)(i) require those that meet the definition of a retail forex CPO under 17 C.F.R. § 5.1(d)(1) to register as a CPO with the CFTC.

82.    During the Relevant Period, MTI acted as a CPO by engaging in a business that was in the nature of a commodity pool, investment trust, syndicate, or similar enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or otherwise, for the purpose of trading in off-exchange leveraged, margined or financed forex transactions while failing to register with the CFTC as a CPO in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and 17 C.F.R. § 5.3(a)(2)(i).  During the Relevant Period, MTI was not exempt from registration as a CPO.

83.    7 U.S.C. § 6k(2) makes it unlawful for any person to be associated with a CPO as an officer or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves the solicitation of funds, securities, or property for participation in a commodity pool, unless such person is registered with the CFTC as an AP of a CPO.  Similarly, 17 C.F.R. § 5.3(a)(2)(ii) requires anyone acting as an AP of a CPO for a pooled investment vehicle that engages in retail forex transactions to register as an AP.

84.    Except in certain circumstances not relevant here, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc) and 17 C.F.R. § 5.3(a)(2)(ii) require those that meet the definition of an AP of a retail forex CPO under 17 C.F.R. § 5.1(d)(2) to register as an AP of a CPO with the CFTC.

85.    Throughout the Relevant Period, Steynberg was associated with CPO MTI as an officer or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool, while failing to register with the CFTC as an AP of the CPO MTI in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii). Throughout the Relevant Period, Steynberg was not exempt from the requirement to register as an AP of a CPO.

86.    The foregoing acts, omissions, and failures by Steynberg occurred within the scope of his employment, agency, or office with MTI during the Relevant Period.  Therefore, MTI is liable for Steynberg's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

87.    Steynberg held and exercised direct and indirect control over MTI and either did not act in good faith or knowingly induced MTI's violations of 7 U.S.C. § 6m(1) during the Relevant Period.  As a controlling person of MTI, Steynberg is liable for MTI's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i), pursuant to 7 U.S.C. § 13c(b).

88.    Each instance during the Relevant Period in which MTI acted as an unregistered CPO, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

89.    Each instance during the Relevant Period in which Steynberg acted as an AP of MTI, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii).

## VII.    RELIEF REQUESTED

WHEREFORE, the CFTC respectfully requests that this Court, as authorized by Section 6c(a) of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.    Find that Defendants violated Sections 2(c)(2)(C)(iii)(I)(cc), 4b(a)(2)(A)-(C), 4k(2), 4m(1), and 4o(1)(A)-(B) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A)-(C), 6k(2), 6m(1), 6o(1)(A)-(B), and Regulations 4.20(a)(1), (b), and (c), 5.2(b)(1)-(3), 5.3(a)(2)(i) and (ii), 17 C.F.R. §§ 4.20(a)(1), (b), (c), 5.2(b)(1)-(3), 5.3(a)(2)(i), (ii) (2021);

B.    Enter an order of permanent injunction restraining, enjoining and prohibiting Defendants and any other person or entity in active concert with them, from engaging in conduct

in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A)-(C), 6k(2), 6m(1), 6o(1)(A)-(B), and 17 C.F.R. §§ 4.20(a)(1), (b), (c), 5.2(b)(1)-(3), 5.3(a)(2)(i), (ii) (2021);

     C.     Enter an order of permanent injunction prohibiting Defendants and any other person or entity in active concert with them from, directly or indirectly:

1) Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

2) Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021)), for accounts held in the name of Defendants or for accounts in which Defendants have a direct or indirect interest;

3) Having any commodity interests traded on Defendants' behalf;

4) Controlling or directing the trading for, or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6) Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021); and

7) Acting as a principal (as that term is defined in Regulation 3.1, 17 C.F.R. § 3.1(a) (2021)), agent, or any other officer or employee of any person

registered, exempted from registration, or required to be registered with the

CFTC except as provided for in 17 C.F.R. § 4.14(a)(9);

D.      Enter an order requiring Defendants, as well as any successors thereof, to

disgorge, pursuant to such procedures as the Court may order, all benefits received including, but

not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly

or indirectly, from acts or practices which constitute violations of the Act and Regulations as

described herein, including pre-judgment and post-judgment interest;

E.      Enter an order requiring Defendants, as well as any successors thereof, to make

full restitution, pursuant to such procedures as the Court may order, to every person or entity

who sustained losses proximately caused by Defendants' violations described herein, including

pre-judgment and post-judgment interest;

F.      Enter an order directing Defendants, as well as any successors thereof, to rescind,

pursuant to such procedures as the Court may order, all contracts and agreements, whether

implied or express, entered into between them and any of the participants whose funds were

received by Defendants as a result of the acts and practices that constituted violations of the Act

and Regulations, as described herein;

G.      Enter an order directing Defendants, as well as any successors thereof, to pay a

civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty

prescribed by 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil

Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701,

129 Stat. 584, 599-600, *see* 17 C.F.R. § 143.8 (2021), or subsequent annually adjusted amounts,

for each violation of the Act and Regulations, as described herein;

H.     Enter an order directing that Defendants, and any successors thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to participants and other persons in connection with commodity interests and all disbursements for any purpose whatsoever of funds received from commodity interests, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind from at least December 2017 to the date of such accounting;

I.     Enter an order requiring Defendants, and any successors thereof, to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2); and

J.     Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated:  June 30, 2022                         Respectfully submitted,

By: /s/ Timothy J. Mulreany
Timothy J. Mulreany
(Maryland Bar No. 8812160123)
Danielle E. Karst (D.C. Bar No. 481881)
COMMODITY FUTURES TRADING
COMMISSION
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone:  (202) 418-5306 (Mulreany)
Facsimile:   (202) 418-5523