**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | **Case No. 1:22-cv-635-DAE** |
| **Plaintiff,** | |
| **v.** | |
| **MIRROR TRADING INTERNATIONAL PROPRIETARY LIMITED, and CORNELIUS JOHANNES STEYNBERG** | |
| **Defendants.** | |

**ORDER GRANTING CONSENT ORDER FOR PERMANENT INJUNCTION, RESTITUTION AND OTHER EQUITABLE RELIEF AGAINST DEFENDANT MIRROR TRADING INTERNATIONAL <u>PROPIETARY LIMITED</u>**

## I.    INTRODUCTION

On June 30, 2022, Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") filed a Complaint against Defendants Cornelius Johannes Steynberg ("Steynberg") and Mirror Trading International Proprietary Limited ("MTI") (collectively, "Defendants"), seeking injunctive and other equitable relief, as well as the imposition of civil penalties, for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26, and the CFTC's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pts. 1–190 (2023).   (Dkt. # 38.)

## II.    CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Complaint against Defendant MTI without a trial on the merits or any further judicial proceedings, MTI:

1.    Consents to the entry of this Consent Order for Permanent Injunction, Restitution, and Other Equitable Relief Against Defendant MTI ("Consent Order");

2.    Affirms that it has read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the CFTC or any member, officer, agent, or representative thereof, or by any other person, to induce consent to this Consent Order;

3.    Acknowledges service of the summons and Complaint;

4.    Admits the jurisdiction of this Court over it and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1;

5.    Admits the jurisdiction of the CFTC over the conduct and transactions at issue in this action pursuant to the Act;

6.    Admits that venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e);

7.    Waives:

(a)    Any and all claims that it may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2023), relating to, or arising from, this action;

(b)    Any and all claims that it may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201–253, 110 Stat. 847, 857–74 (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this action;

(c)    Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or

any other relief, including this Consent Order; and

(d)    Any and all rights of appeal from this action;

8.    Consents to the continued jurisdiction of this Court over it for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if Defendant MTI now or in the future resides outside the jurisdiction of this Court;

9.    Agrees that it will not oppose enforcement of this Consent Order on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and hereby waives any objection based thereon;

10.    Agrees that neither it nor any of its agents or employees under its authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect Defendant's and/or its agents' and/or employees': (a) testimonial obligations, or (b) right to take legal positions in other proceedings to which the CFTC is not a party. Defendant shall comply with this agreement, and shall undertake all steps necessary to ensure that all of its agents and/or employees under its authority or control understand and comply with this agreement.

11.    Consents to the entry of this Consent Order without admitting or denying the allegations of the Complaint or any findings or conclusions in this Consent Order, except as to jurisdiction and venue, which it admits;

12.    Consents to the use of the findings and conclusions in this Consent Order in this proceeding and in any other proceeding brought by the CFTC or to which the CFTC is a

party or claimant, and agrees that they shall be taken as true and correct and be given preclusive effect therein, without further proof;

13.    Does not consent, however, to the use of this Consent Order, or the findings and conclusions herein, as the sole basis for any other proceeding brought by the CFTC or to which the CFTC is a party, other than a proceeding in bankruptcy, or receivership; or proceeding to enforce the terms of this Order; and

14.    Agrees that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Defendant in any other proceeding.

### III.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay.  The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction and equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, as set forth herein.  The findings and conclusions in this Consent Order are not binding on any other party to this action.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS:**

**A.    Findings of Fact**

**The Parties**

15.    Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act and the Regulations.

16.    Defendant **Mirror Trading International Proprietary Limited** was a company organized and operated pursuant to the laws of the Republic of South Africa, with a principal place of business in Stellenbosch, Western Cape South Africa.  Steynberg founded MTI in the

Republic of South Africa in April 2019.  In December 2020, the High Court of South Africa placed MTI into involuntary liquidation and appointed joint liquidators who are in control of MTI and managing its assets.  MTI's insolvency proceeding is pending before the High Court of South Africa.  MTI's joint liquidators commenced a case under Chapter 15 of the United States Bankruptcy Code on February 9, 2023, known as *In re Mirror Trading Int'l (PTY) Ltd.*, No. 23-11046-PDR (Bankr. S.D. Fla. Feb. 9, 2023) (the "U.S. Bankruptcy Proceeding").[1]  MTI has never been registered with the CFTC in any capacity.

17.     Defendant **Cornelius Johannes Steynberg**, who is not a party to this Consent Order, is an individual who, during all times relevant to the Complaint, held himself out as the Director and CEO of MTI.  Upon information and belief, he is a fugitive from South African law enforcement but was detained in the Federative Republic of Brazil on an INTERPOL arrest warrant in or about late-December 2021.  Steynberg has never been registered with the CFTC in any capacity.

**The Fraudulent Scheme**

18.     From at least May 18, 2018 through at least March 30, 2021 (the "Relevant Period" identified in the Complaint), Steynberg, individually and as the controlling person of MTI, engaged in an international fraudulent multilevel marketing ("MLM") scheme to solicit Bitcoin from members of the public for participation in a commodity pool operated by MTI ("commodity pool" or "Pool").  The commodity pool was controlled by MTI and Stenberg and purportedly traded off-exchange, retail foreign currency ("forex") on a leveraged, margined

---

[1] The U.S. Bankruptcy Court granted recognition of the South African liquidation proceeding pursuant to 11 U.S.C. §§ 1515, 1517.  Order Granting Recognition of Foreign Main Proceeding, *In re Mirror Trading Int'l (PTY) Ltd.*, No. 23-11046-PDR (Bankr. S.D. Fla. March 18, 2023).

and/or financed basis with participants who were not eligible contract participants ("ECPs") through a proprietary "bot" or software program.

19.     During the Relevant Period, Steynberg, individually and as the principal and agent of MTI, accepted at least 29,421 Bitcoin—with a value of over $1,733,838,372 at the end of the Relevant Period—from at least 23,000 individuals from the United States, and even more throughout the world, to participate in an unregistered commodity pool.  Defendants misappropriated, either directly or indirectly, all of the Bitcoin they accepted from pool participants.

20.     Defendants, through Steynberg, knowingly and falsely represented to actual and prospective pool participants that Defendants operated a pooled forex account, using an experienced trader to produce consistent, high rates of return.  Steynberg held himself out as the founder and CEO of MTI.

21.     MTI acted at all times during the Relevant Period as a commodity pool operator ("CPO") without being registered with the CFTC, as required by the Act.

**Defendants' Solicitations to Pool Participants**

22.     Throughout the Relevant Period, Defendants solicited actual and prospective participants through social media such as Facebook, Instagram, and YouTube.  Defendants also solicited through in-person meetings, word-of-mouth, instant messaging services such as Telegram, podcasts, and websites operated by Steynberg, including:

*www.mirrortradinginternational.au.za, www.mtimembers.com, www.mymticlub.com*, and *www.mymticlub.com* (collectively, the "websites").

23.     Defendants targeted their solicitations to non-ECPs with limited trading experience, claiming participants could earn "passive income" by funding their investment with

"as little as $100" and "no trading experience required."  The only requirements to become a participant, pursuant to Defendants' social media, were that a prospective participant was at least 18 years of age and had Bitcoin to fund participation in the Pool.  The minimum participation amount was $100, or a fraction of a Bitcoin.

24.    Steynberg, individually and as the agent of MTI, represented through social media that there were "no membership fees, no subscriptions, no packages, no costs & no deductions." Steynberg, individually and as the agent of MTI, claimed MTI's trading "bot" achieved "profits" of 10% per month, and that the MTI Pool had never had a losing trading day except for one day. Steynberg, individually and as the agent of MTI, represented to actual and prospective participants via social media that:  "The system is fully automated and you will receive your daily [pool participant] statement detailing the profits or loss from the trades for the day.  These statements will be in your back office from Tuesdays to Saturdays."

25.    Defendants provided each pool participant access to what Defendants referred to as a "back office," which was an online statement each participant could access using their login credentials to view how much profit their Bitcoin investment purportedly earned in the Pool account.  Defendants advised participants that:  "Your daily trade profits are automatically compounded in the trading pool."  Steynberg, individually and as the agent of MTI, also represented to participants that they could withdraw their funds, in full or in part, at any time, and that participants' Bitcoin would be sent to their Bitcoin wallet within 48 hours of a withdrawal request.

26.    Steynberg testified under oath before the South African Financial Services Conduct Authority ("FSCA") on July 20, 2020, that at the time of MTI's formation in April 2019, MTI purportedly entered into a profit-sharing agreement with a trader named "Quinton,"

who was to conduct all trading on behalf of all members.  Steynberg testified that "Quinton" purportedly used an FXChoice multi-account manager ("MAM" account) "linked" to each participant's individual account to control the trading in all participants' accounts.  Steynberg opened and controlled the MAM account in MTI's name at FXChoice.

27.    Steynberg testified under oath before the FSCA that from April 2019 to July 2019, participants initially had their own accounts that were "linked" to the MetaTrader 4 ("MT4") electronic trading platform, and MT4 traded the accounts automatically.  Steynberg further testified that in July 2019, due to heavy trading losses, all participants had their purported individual accounts closed and all Bitcoin transferred to a single pooled account controlled by Defendants.  Following the heavy losses stained in the April to July 2019 time period, Defendants sent a notice to each participant stating in relevant part:

> Over the last couple of weeks, MTI had issues with the traders, which resulted in losses for ourselves and the members.  We have a solution to recover all member's funds.  Those willing to take the journey with us over the next few weeks will be happily surprised with the trading system that we managed to put together for our members. . . . At the moment, it is not possible to deploy the trading system on all FXChoice accounts due to licensing restrictions.  We are, however, allowed to use the system in a pooled account environment. To switch to the pooled account, please follow the steps below.

**MTI Pooled Account at FXChoice**

28.    Defendants opened a single commodity pool account in the name of MTI at FXChoice, account No.**4850, in August 2019.  Defendants falsely represented to actual and prospective participants that MTI operated a commodity pool that traded forex agreements, contracts or transactions, on a leveraged, margined or financed basis, and that the only assets they accepted for investment in the Pool account was Bitcoin.  Specifically, Defendants claimed to be trading foreign currency pairs in the Pool account on a leveraged or margined basis, initially at FXChoice, and later purportedly at Trade300.  Pool participants registered via

Defendants' websites, where they were advised that Defendants only accepted Bitcoin to secure their participation in the Pool.  Defendants directed participants to transfer their Bitcoin to one of the MTI E-Wallets, which were controlled by Steynberg.  Defendants then purportedly transferred the Bitcoin to the MTI Pool account at FXChoice, and later, to an MTI Pool account purportedly at Trade300.

29.     Throughout the Relevant Period, Steynberg was in sole control of the MTI E-Wallets receiving participants' funds and controlled the movement of Bitcoin from the MTI E-Wallets to FXChoice accounts and elsewhere.

30.     Beginning on or about August 2019, Steynberg, individually and as the agent of MTI, represented to actual and prospective participants that MTI used a high frequency artificial intelligence trading "bot," together with a "head trader" and a "trading team," that purportedly traded the Pool's account at FXChoice, earning large profits.  These representations were false.  FXChoice records show that the Pool account traded using only a small fraction of participants' Bitcoin, that this limited trading was at an overall loss, and that Steynberg made many of the trades via a mobile device.

31.     After Defendants created the purported FXChoice Pool account, they provided "trading statements" showing profitable trades on behalf of the Pool in this account.  In fact, these "trading statements" were not associated with any actual pooled accounts, but were in fact statements from a simulated "demo" account that never actually traded forex, Bitcoin or anything else.  Defendants failed to disclose to participants that all of Defendants' representations to participants regarding trading, profitability and/or the existence of a commodity pool account were false.  Defendants further failed to disclose to participants that all of the purported "trading statements" were false and created by Defendants.

**The Final Phase of the Scheme**

32.     On or about June 8, 2020, FXChoice began receiving complaints from MTI participants that the trades shown in MTI's trading reports provided to participants did not correlate with the live trades purportedly made in MTI's Pool account.  FXChoice conducted a compliance review of the MTI Pool account and determined that the "account statements" provided to participants were actually simulated trades from "demo" accounts created by Steynberg, individually and as the agent of MTI, via the MT4 application.  FXChoice further determined that Defendants deleted any of the "demo" accounts' "losing" trades in the "account statements" and presented only "winning trades," thereby giving the false impression to participants that Defendants' trading "bot" was profitably trading.  Finally, FXChoice determined that a number of trades in MTI's FX Choice Pool account were manually placed via a mobile device.

33.     As a result of its compliance investigation, on June 10, 2020, FXChoice blocked all transactions in MTI's Pool account pending a compliance review.  On July 13, 2020, Steynberg, individually and as the agent of MTI, unsuccessfully attempted to withdraw 280 Bitcoin from the blocked Pool account.  FXChoice refused Defendants' withdrawal request and informed Defendants that they were required to provide audited financial statements for MTI. As a result of Defendants' failure to provide FXChoice with the requested audited financial statements, on August 7, 2020, FXChoice marked the Pool account No.**4850 as "fraud" and froze the 1,280 Bitcoin remaining in the account.

34.     Subsequently, Steynberg, individually and as the agent of MTI, represented to participants that MTI would transfer all of the Pool's trading accounts from FXChoice to a purported online broker identified as Trade300.  Steynberg, individually and as the agent of MTI,

represented to participants that Trade300 was another online forex trading platform, and that MTI continued to earn large profits while trading through Trade300. Upon information and belief, Trade300 is a fictious trade broker created by Steynberg to further the fraudulent scheme.

35.     Steynberg, individually and as the agent of MTI, misappropriated pool participants' funds by soliciting funds for trading on behalf of the Pool and then depositing and holding participants' funds in E-Wallets controlled by Steynberg instead of segregating the funds in a pool account and using the funds to trade on behalf of the Pool's participants.

36.     Throughout the Relevant Period, participants sent 29,421 Bitcoin to Defendants' E-Wallets as instructed. However, Defendants deposited only 1,846.72 of participants' 29,421 Bitcoin into the FXChoice Pool account. Defendants never deposited the remaining 27,574 Bitcoin into the FXChoice Pool account or any account at Trade300, and failed to use those funds for any trading on behalf of participants. Instead, Steynberg, individually and as the agent of MTI, misappropriated participants' Bitcoin for his personal use.

37.     Defendants also misappropriated some of participants' funds by providing Bitcoin to certain participants as purported trading "profits" or "bonuses" in order to create the illusion that the Pool was trading and trading profitably.

38.     At no time did Defendants create, or MTI operate, the Pool as an entity cognizable as a legal entity separate from the pool operator, MTI. As a result, at no time were any assets, in this case Bitcoin, from pool participants received in the Pool's name because a separate legal entity in the name of the pool was never created. Instead, all Bitcoin were sent directly from participants to E-Wallets owned and controlled by Defendants.

39.     During the Relevant Period, Defendants, by and through Steynberg, failed to maintain pool assets separately from Steynberg's own funds. Steynberg, individually and as the

agent of MTI, commingled pool participants' assets with personal funds of Steynberg. As described above, pool participants deposited Bitcoin into E-Wallet(s) controlled by Steynberg. Defendants held these assets in Steynberg's personal E-Wallets instead of segregating them in a pool account.

### Defendants' Material Omissions and Misrepresentations of Material Facts

40.     In furtherance of the fraudulent scheme, Defendants knowingly made material omissions of fact in solicitations and other communications with actual and prospective pool participants, including by failing to disclose that:

  a.    Defendants misappropriated pool participants' funds by soliciting funds for trading and then retaining participants' funds in Steynberg's personal E-Wallets instead of segregating the funds in a pool account and using the funds to trade on behalf of the Pool;

  b.    There was no trading "bot" successfully trading on behalf of participants;

  c.    No profitable trading in forex, or anything else, took place on behalf of pool participants;

  d.    "Account statements" provided to participants were actually simulated trades from "demo" accounts created via the MT4 application;

  e.    The broker Trade300 did not exist and was created by Steynberg to further the fraudulent scheme; and,

  f.    Purported "returns" paid to some pool participants were in fact the principal deposits of other participants and were not generated by profitable trading.

41.     Similarly, during the Relevant Period, Defendants, by and through Steynberg, misrepresented, among other things, that:

  a.    Pool participants' Bitcoin would be pooled and used to trade forex contracts on participants' behalf;

  b.    Profits were achieved through trading; and

  c.    Trading "profits" were distributed to participants.

42.     These representations were false because Defendants deposited only a small portion of participants' Bitcoin into the FXChoice Pool account for a limited time period.  The FXChoice Pool account never traded profitably, there was no Trade300 account, and there were no profits to distribute to participants.

**Defendants' Failure to Register**

43.     During the Relevant Period, MTI acted in a capacity as a CPO by soliciting, accepting, and receiving funds, securities, or property, in this case Bitcoin, from the public while engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of, among other things, trading in forex, without being registered with the CFTC as a CPO.

44.     Throughout the Relevant Period, Steynberg acted in a capacity as an AP of MTI by, in his capacity as a partner, officer, employee, consultant or agent of the CPO MTI, soliciting or supervising the solicitation of funds for participation in the Pool, without being registered with the CFTC as an AP of a CPO.

45.     On or about July 27, 2020, the Texas State Securities Board ("TSSB") issued a Cease and Desist Order against Steynberg and MTI, among others, finding their solicitations were materially misleading, and that they were operating a fraudulent MLM scheme involving digital assets and forex, which had defrauded Texas residents.  The TSSB ordered Steynberg and MTI to immediately cease and desist all operations in the State of Texas.  Despite the issuance of this Order, upon information and belief Defendants continued to unlawfully solicit residents in Texas.

**B.**    **Conclusions of Law**

      **1.**    **Jurisdiction and Venue**

46.    This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  7 U.S.C. § 13a-1(a), provides that the CFTC may bring actions for injunctive relief or to enforce compliance with the Act or any rule, regulation, or order thereunder in the proper district court of the United States whenever it shall appear to the CFTC that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

47.    Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because MTI transacted business in this District, and certain acts and practices in violation of the Act and Regulations occurred within this District, among other places.

      **2.**    **Statutory and Regulatory Background**

48.    A CPO is defined in 7 U.S.C. § 1a(11), in relevant part, as:  "The term 'commodity pool operator' means any person . . . engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any . . . agreement, contract, or transaction described in section 2(c)(2)(C)(i) or section 2(c)(2)(D)(i)."

49.    Similarly, for the purposes of retail forex transactions, a CPO is defined in 17 C.F.R. § 5.1(d)(1) (2023) as "any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an eligible contract participant as defined in section 1a(18) of the Act, and that engages in retail forex transactions."

50.    An ECP is defined by Section 1a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi), in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of $10,000,000, or $5,000,000 and who enters into the agreement, contract, or transaction to manage the risk associated with an asset owned or a liability incurred, or reasonably likely to be owned or incurred, by the individual.

51.    An AP of a CPO is defined by Regulation 1.3, 17 C.F.R. § 1.3 (2023), as any person who is associated with a CPO as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged.

52.    Further, pursuant to 17 C.F.R. § 5.1(d)(2) (2023), any person associated with a CPO "as a partner, officer, employee, consultant or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves:  (i) [t]he solicitation of funds, securities, or property for a participation in a pooled investment vehicle; or (ii) [t]he supervision of any person or persons so engaged" is an AP of a retail forex CPO.

53.    7 U.S.C. § 6b(a)(2)(A)-(C) makes it unlawful:

[F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, [. . .] that is made, or to be made, for or on behalf of, or with, any other person other than on or subject to the rules of a designated contract market – (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for

the other person any false record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

54.     Pursuant to 7 U.S.C. § 2(c)(2)(C)(iv), 7 U.S.C. § 6b applies to the forex agreements, contracts, or transactions offered by Defendants "as if" they were contracts of sale of a commodity for future delivery.  Further, 7 U.S.C. § 2(c)(2)(C)(ii)(I), makes the forex agreements, contracts, or transactions here "subject to" 7 U.S.C. § 6b.  Finally, Section 2(c)(2)(C)(vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(vii), makes clear the CFTC has jurisdiction over an account or pooled investment vehicle that is offered for the purpose of forex transactions described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. § 2(c)(2)(C)(i).

55.     17 C.F.R. § 5.2(b)(1)-(3) (2023) makes it unlawful for any person, by use of the mails or by any instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction:  (1) to cheat or defraud or attempt to cheat or defraud any person; (2) willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or (3) willfully to deceive or attempt to deceive any person by any means whatsoever.

56.     17 C.F.R. § 4.20(a)(1) requires a CPO to operate their commodity pool as an entity cognizable as a legal entity separate from that of the pool operator, with certain specified exceptions not applicable here.

57.     17 C.F.R. § 4.20(b) provides:  "All funds, securities or other property received by a commodity pool operator from an existing or prospective pool participant for the purchase of an interest or as an assessment (whether voluntary or involuntary) on an interest in a pool that it operates or that it intends to operate must be received in the pool's name."

58.     17 C.F.R. § 4.20(c) provides, "[n]o commodity pool operator may commingle the property of any pool that it operates or that it intends to operate with the property of any other person."

59.     7 U.S.C. § 6m(1) makes it unlawful for any CPO, unless registered with the CFTC, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO.  Similarly, 17 C.F.R. § 5.3(a)(2)(i) requires anyone acting as a CPO for a pooled investment vehicle that engages in retail forex transactions to register as a CPO.

60.     Subject to certain exceptions not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) states in part, that:

> A person, unless registered in such capacity as the Commission by rule, regulation, or order shall determine and a member of a futures association registered under section 17 [of the Act], shall not . . .
> . . . .
> (cc) operate or solicit funds, securities, or property for any pooled investment vehicle that is not an eligible contract participant in connection with [applicable retail forex agreements, contracts, or transactions].

61.     Except in circumstances not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) and 17 C.F.R. § 5.3(a)(2)(i) require those that meet the definition of a retail forex CPO under 17 C.F.R. § 5.1(d)(1) to register as a CPO with the CFTC.

62.     7 U.S.C. § 6k(2) makes it unlawful for any person to be associated with a CPO as an officer or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves the solicitation of funds, securities, or property for participation in a commodity pool, unless such person is registered with the CFTC as an AP of a CPO.  Similarly, 17 C.F.R. § 5.3(a)(2)(ii) requires anyone acting as an AP of a CPO for a pooled investment vehicle that engages in retail forex transactions to register as an AP.

63.     Except in certain circumstances not relevant here, 7 U.S.C.

§§ 2(c)(2)(C)(iii)(I)(cc) and 17 C.F.R. § 5.3(a)(2)(ii) require those that meet the definition of an

AP of a retail forex CPO under 17 C.F.R. § 5.1(d)(2) to register as an AP of a CPO with the

CFTC.

### 3.     **MTI Violated the Act and Regulations**

**MTI Committed Fraud in Connection with Forex in Violation of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3) (2023)**

64.     By the conduct described in paragraphs 18 through 45 above, MTI violated 7

U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3) (2023), by cheating or defrauding, or

attempting to cheat or defraud, and willfully deceiving, or attempting to deceive, other persons in

connection with Defendants' offering of, or entering into, off-exchange leveraged or margined

forex transactions with non-ECPs, by, among other things:  (i) fraudulently soliciting participants

and prospective participants by making material misrepresentations and omissions about, among

other things, MTI's trading abilities and profits; (ii) misappropriating participants' funds; and

(iii) posting false account statements of participants' profits from demo trading.

**MTI Committed Fraud as a CPO in Violation of 7 U.S.C. § 6o(1)(A)-(B)**

65.     During the Relevant Period, MTI acted as a CPO, by soliciting, accepting, or

receiving funds or property (in the form of Bitcoin) from the public while engaged in a business

that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the

purpose of trading in off-exchange, leveraged or margined forex transactions.  During the

Relevant Period, MTI was not exempt from registration as a CPO.

66.     By the conduct described in paragraphs 18 through 45 above, MTI violated 7

U.S.C. § 6o(1)(A)-(B) by employing a device, scheme, or artifice to defraud actual and

prospective participants or engaging in transactions, practices, or a course of business which

operated as a fraud or deceit upon actual or prospective participants, including without limitation, fraudulent solicitations to actual and prospective participants that contained misrepresentations and omissions of material facts, and misappropriation of participants' funds.

**MTI Failed to Operate Commodity Pool as a Separate Legal Entity, Failed to Receive Funds in the Pool's Name, and Commingled Pool Funds in Violation of 17 C.F.R. § 4.20(a)(1), (b), (c) (2023)**

67.     By the conduct described in paragraph 18 through 45 above, MTI, while acting as a CPO, violated 17 C.F.R. § 4.20(a)(1) (2023) by failing to operate the commodity pool as a legal entity separate from itself.

68.     By the conduct described in paragraph 18 through 45 above, MTI, while acting as a CPO, violated 17 C.F.R. § 4.20(b) (2023) by receiving funds from existing or prospective pool participants for the purchase of an interest in the Pool without receiving the same in the Pool's name.

69.     By the conduct described in paragraphs 18 through 45 above, MTI, while acting as a CPO, violated 17 C.F.R. § 4.20(c) (2023) by commingling pool funds with the personal funds of Steynberg.

**MTI Failed to Register as a CPO in Violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and 17 C.F.R. §§ 5.3(a)(2)(i) (2023)**

70.     By the conduct described in paragraphs 18 through 45 above, MTI acted as a CPO while failing to register with the CFTC as a CPO in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and 17 C.F.R. § 5.3(a)(2)(i) (2023).

### 4.     **MTI Is Liable for the Actions of Its Employee and Officer, Steynberg**

71.     7 U.S.C. § 2(a)(1)(B) provides that "the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust, within the scope of his employment or office shall be deemed the act, omission, or failure of

such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person."

72.    17 C.F.R. § 1.2 (2023) mirrors this statutory provision and provides that "the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust, within the scope of his employment or office, shall be deemed the act, omission, or failure of such individual, association, partnership, corporation or trust as well as of such official, agent, or other person."

73.    During the Relevant Period, Steynberg held himself out as the Shareholder, Director and CEO of MTI and committed his violative acts within his capacity as a principal and agent of MTI.  The acts, omissions, and failure of Steynberg occurred within the scope of his employment with MTI.  Therefore, MTI is liable for Steynberg's violations of the Act and Regulations described in this Consent Order.

**5.    <u>Need for Injunctive Relief</u>**

74.    Unless restrained and enjoined by this Court, there is a reasonable likelihood that MTI will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

## IV.    PERMANENT INJUNCTION

75.    Based upon and in connection with the foregoing conduct, pursuant to 7 U.S.C. § 13a-1, MTI is permanently restrained, enjoined and prohibited from directly or indirectly:

a.    In or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market (A) to cheat or defraud, or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order

or contract, or in regard to any act of agency performed, with respect to any order or contract for or, with the other person, in violation of 7 U.S.C. § 6b(a)(2)(A)-(C) or 17 C.F.R. § 5.2(b)(1)-(3) (2023);

b.    using the mails or any means or instrumentality of interstate commerce, directly or indirectly, as a CPO, to (A) employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) engage in any transaction, practice, or course of business that operates as a fraud or deceit upon any client or participant or prospective client or participant, in violation of 7 U.S.C. § 6o(1)(A)-(B);

c.    failing to operate a commodity pool as an entity cognizable as a legal entity separate from that of the pool operator in violation of 17 C.F.R. § 4.20(a)(1) (2023);

d.    failing to receive in the pool's name all funds, securities or other property received by a commodity pool operator from an existing or prospective pool participant for the purchase of an interest or as an assessment (whether voluntary or involuntary) on an interest in a pool that it operates or that it intends to operate in violation of 17 C.F.R. § 4.20(b);

e.    commingling the property of any commodity pool that it operates or that it intends to operate with the property of any other person in violation of 17 C.F.R. § 4.20(c) (2023); and

f.    failing to register as a CPO, in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and 17 C.F.R. § 5.3(a)(2)(i) (2023).

76.    MTI is also permanently restrained, enjoined and prohibited from directly or indirectly:

a.    Trading on or subject to the rules of any registered entity (as that term is defined in 7 U.S.C. § 1a(40));

b.    Entering into any transactions involving "commodity interests" (as that term is defined in 17 C.F.R. § 1.3 (2023)), or digital asset commodities, such as Bitcoin, for its own personal account or for any account in which it has a direct or indirect interest;

c.    Having any commodity interests or digital asset commodities, such as Bitcoin, traded on its behalf;

d.    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital asset commodities, such as Bitcoin;

e.       Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests or digital asset commodities, such as Bitcoin;

f.       Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in 17 C.F.R. § 4.14(a)(9) (2023); and/or

g.       Acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2023)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9) (2023).

## V.       RESTITUTION AND CIVIL MONETARY PENALTY

### A.       Restitution

77.       MTI shall pay restitution in the amount of one billion, seven hundred thirty-three million, eight hundred thirty-eight thousand, three hundred seventy-two dollars ($1,733,838,372.00) ("Restitution Obligation").  The CFTC shall not take any action to collect payment for the Restitution Obligation as long as the automatic stay provision is in place in the U.S. Bankruptcy Proceeding, *In re Mirror Trading Int'l (PTY) Ltd*., No. 23-11046-PDR (Bankr. S.D. Fla. Feb. 9, 2023).

78.       The amounts payable to each pool participant shall not limit the ability of any pool participant from proving that a greater amount is owed from MTI or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any pool participant that exist under state or common law.

79.       Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each pool participant of MTI who suffered a loss is explicitly made an intended third-party beneficiary of this Consent Order and may seek to enforce obedience of this Consent Order to obtain satisfaction of any portion of the restitution that has not been paid by MTI to ensure continued compliance with any

provision of this Consent Order and to hold MTI in contempt for any violations of any provision of this Consent Order.

**B.      Provisions Related to of Monetary Sanctions**

80.      Partial Satisfaction:  Any acceptance by the CFTC of partial payment of MTI's Restitution Obligation shall not be deemed a waiver of its obligation to make further payments pursuant to this Consent Order, or a waiver of the CFTC's right to seek to compel payment of any remaining balance.

**C.      Cooperation**

81.      MTI shall cooperate fully and expeditiously with the CFTC, including the CFTC's Division of Enforcement and any other governmental agency, in this action, and in any current or future CFTC investigation or action related thereto.  MTI shall also cooperate in any investigation, civil litigation, or administrative matter related to, or arising from, this action.

## VI.    MISCELLANEOUS PROVISIONS

82.      Until such time as MTI satisfies in full its Restitution Obligation under this Consent Order, upon the commencement by or against MTI of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of MTI's debts, all notices to creditors required to be furnished to the CFTC under Title 11 of the United States Code or other applicable law with respect to such insolvency, receivership, bankruptcy or other proceedings, shall be sent to the address below:

> Secretary of the Commission
> Office of the General Counsel
> Commodity Futures Trading Commission
> Three Lafayette Centre
> 1155 21st Street N.W.
> Washington, DC 20581

83.    Notice:  All notices required to be given by any provision in this Consent Order,

except as set forth in paragraph 82 above, shall be sent certified mail and electronic mail, return

receipt requested as follows:

Notice to **CFTC**:

> Ian McGinley, Director of Enforcement
> Commodity Futures Trading Commission
> Three Lafayette Centre
> 1155 21st Street N.W.
> Washington, D.C. 20581
> IMcGinley@cftc.gov

Notice to **Defendant Mirror Trading International (Pty) Ltd**:

> c/o Christopher J. Redmond, Esq
> Attorney for MTI Joint Liquidators
> Redmond Law Firm LLC
> 13220 Metcalf, Suite 310
> Overland Park, Kansas 66213
> Christopher.redmond@christopherredmondlawfirm.com

Notice to **Defendant Johannes Steynberg**:

> c/o Maria Saad, Esq., Dhyego Lima, Esq.
> Saad & Lima Advogados
> Rue Gomes de Carvalho
> 10679, 7 andar, Vila Olímpia
> 04547-004 São Paulo, SP
> fernanda@saad.adv.br

All such notices to the CFTC shall reference the name and docket number of this action.

84.    Change of Address/Phone:  Until such time as MTI satisfies in full its Restitution

Obligation as set forth in this Consent Order, MTI shall provide written notice to the CFTC by

certified mail of any change to his telephone number and mailing address within ten calendar

days of the change.

85.    Entire Agreement and Amendments:  This Consent Order incorporates all of the

terms and conditions of the settlement among the parties hereto to date.  Nothing shall serve to

amend or modify this Consent Order in any respect whatsoever, unless: (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

86. Invalidation: If any provision of this Consent Order or if the application of any provision or circumstance is held invalid, then the remainder of this Consent Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

87. Waiver: The failure of any party to this Consent Order or of any pool participant at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party or pool participant at a later time to enforce the same or any other provision of this Consent Order. No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

88. Continuing Jurisdiction of this Court: This Court shall retain jurisdiction of this action to ensure compliance with this Consent Order and for all other purposes related to this action, including any motion by MTI to modify or for relief from the terms of this Consent Order.

89. Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Consent Order shall be binding upon MTI, upon any person under MTI's authority or control, and upon any person who receives actual notice of this Consent Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendants.

90.    Authority:  All eight liquidators warrant that they are the joint South African Liquidators of Defendant MTI who have been appointed by a South African court to manage MTI's assets.

91.    Counterparts and Facsimile Execution:  This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart.  Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

92.    Contempt:  MTI understands that the terms of the Consent Order, except with respect to restitution, are enforceable through contempt proceedings, and that, in any such proceedings it may not challenge the validity of this Consent Order.

93.    Agreements and Undertakings:  MTI shall comply with all of the undertakings and agreements set forth in this Consent Order.


There being no just reason for delay, the Clerk of the Court is hereby **ORDERED to ENTER** this Consent Order for MTI forthwith and without further notice.  The Clerk of the Court is also **ORDERED to CLOSE** the case.


**IT IS SO ORDERED** on this 6th day of September.

_____

David Alan Ezra
Senior United States District Judge

CONSENTED TO AND APPROVED BY:

_____
Defendant MTI
c/o Chavonnes Badenhorst St. Clair Cooper
Foreign Representative of MTI and Liquidator
appointed by the High Court of South Africa
CK Trust (Pty) Ltd.
Unit 1
Sir Benjamin Promenade, Oxford Street
Durbanville, Western Cape
Republic of South Africa

Date: 15 August 2023

Approved as to form:

_____
Christopher J. Redmond, Esq.
Attorney for MTI Joint Liquidators
Redmond Law Firm LLC
13220 Metcalf, Suite 310
Overland Park, Kansas 66213
Christopher.redmond@christopherredmondlawfirm.com

Date: 25 AUGUST 2023

_____
Timothy J. Mulreany
Danielle Karst
Commodity Futures Trading
Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone: (202) 418-5306

Date: August 10, 2023